UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BENFORD DAVIS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:22-cv-00488-SEB-TAB ) |
| WEXFORD OF INDIANA, LLC, *et al.*, | ) ) ) |
| Defendants. | ) |

**ORDER DISCUSSING PLAINTIFF'S AND MEDICAL DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Benford Davis alleges that he was deprived of necessary hernia surgery for over a year while incarcerated at Pendleton Correctional Facility (PCF), then deprived of necessary postsurgical care. Mr. Davis and all eleven defendants have moved for summary judgment.

This order addresses the nine medical defendants' motion for summary judgment and Mr. Davis's motion for summary judgment as it pertains to the medical defendants. Dkts. 90, 94. The Court will address the correctional defendants' motion for summary judgment, and Mr. Davis's motion as it pertains to them, in a separate order.

Viewed in the light most favorable to Mr. Davis, the record would not allow any reasonable jury to find deliberate indifference by Defendants Morris, Mitchell, and Hamblen, so they are entitled to summary judgment. Otherwise, both motions are denied because material factual disputes preclude summary judgment for either side.

**I.
Legal Standard**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no

genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material

fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II.
## Factual Background

Mr. Davis is pursuing Eighth Amendment claims against all nine medical defendants. The following facts are undisputed except where disputes are noted.

### A. Parties

Mr. Davis arrived at PCF from another prison on November 6, 2019. Dkt. 93, plaintiff's undisputed material fact (UMF) 8. At that time, he had already been diagnosed with a hernia. Dkt. 95, medical defendants' UMF 10.

Wexford of Indiana, LLC, contracted to provide medical care to Indiana Department of Correction (IDOC) inmates, including those at PCF. Wexford employed eight defendants as members of its medical staff.

Dr. Michael Mitcheff was Wexford's regional medical director. One of Dr. Mitcheff's principal responsibilities was reviewing and either approving or denying other staff members' outpatient referral requests (OPRs). Dkt. 95, UMF 3.

Dr. Martial Knieser was a physician; Sheri Wilson was a physician's assistant (PA); Janet Mitchell was a licensed practical nurse (LPN); and Kathleen Smith and Jody Morris were registered nurses (RNs). *Id.*, UMFs 2, 4–7. Wexford employed all four to treat PCF inmates. *Id.*

Lisa Hamblen was a health services administrator (HSA), and Jessica Love was an administrative assistant. *Id.*, UMFs 8–9. Wexford employed HSA Hamblen and Ms. Love in administrative capacities, and they were not directly involved in or responsible for treating patients. *Id.* One of Ms. Love's responsibilities was submitting OPRs for review. *Id.*, UMF 9.

3

B.   **Outpatient Referral Requests**

When a treating physician at PCF determined that an inmate needed treatment that could not be provided at the prison, the doctor submitted an OPR, which was attached to the inmate's medical chart, and e-mailed an alert to Ms. Love. *See* dkt. 96-10 at ¶¶ 6–7. Ms. Love then "pulled" the OPR from the inmate's chart and forwarded it to the utilization management team for review. *Id.*

The composition, role, and procedures of the utilization management team are not clear. However, the "purpose of the Utilization Management process was to ensure that all correctional patients had access to appropriate care, in the appropriate setting based on individual clinical needs and medical staff capabilities of the patient's institution." Dkt. 95 at UMF 3. The utilization management process was in place because "[i]t is very important that patients in a maximum-security prison . . . get the correct test and consultation the first time to avoid potential security issues related to unnecessary or duplicate offsite testing." *Id.*

Some OPRs made it past the utilization management team and reached Dr. Mitcheff. Then, Dr. Mitcheff "would review the patient's relevant medical records to determine whether the requested care was medically appropriate." Dkt. 95 at UMF 3. "Dr. Mitcheff would either approve the request, or recommend an alternative treatment plan," which "would typically include conservative measures or a change in the testing or consultation being requested." *Id.* If Dr. Mitcheff approved an OPR, protocol called for Ms. Love to fax the approved OPR to the offsite provider's office and wait for their office to call . . . to schedule the visit." Dkt. 96-10 at ¶ 7.

C.   **Mr. Davis's Hernia and Dr. Buckley's OPR**

Mr. Davis had a left inguinal hernia before he arrived at PCF. Dkt. 96-1 at 1–4. "Inguinal hernias occur when part of the membrane lining the abdominal cavity (omentum) or intestine

4

protrudes through a weak spot in the abdomen—often along the inguinal canal, which carries the spermatic cord in men." Mayo Clinic, *Inguinal Hernia*, https://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/syc-20351547 (last visited Feb. 6, 2024).

Dr. Alice Buckley examined Mr. Davis at PCF on January 29, 2020, and submitted an OPR for Mr. Davis to receive an ultrasound. Dkt. 96-1 at 5–11. Dr. Buckley found Mr. Davis's hernia "concerning" due to its location and potential for strangulation. *Id.* at 6, 10. A hernia becomes strangulated when the abdominal wall traps the protruding tissue and cuts off bloodflow to it. *See* May Clinic, *Inguinal Hernia*. " A strangulated hernia can be life-threatening if it isn't treated." *Id.*

No one acted on Dr. Buckley's OPR. The record does not tell whether it was forwarded to the utilization management team or Dr. Mitcheff, and the medical defendants offer no explanation.

Mr. Davis visited with PA Wilson on February 21 and May 22, 2020. Dkt. 91-1 at 64–68, 75–79. Her treatment notes do not indicate that they discussed his hernia or that she recognized a hernia when examining his abdomen. *Id.* at 66, 77. No evidence indicates whether PA Wilson knew about Dr. Buckley's OPR. Mr. Davis saw non-defendant Nurse Alyssa Karlson regarding his hernia on July 25. Dkt. 96-1 at 13–15. She offered over-the-counter pain medication. *Id.*

**D.     Dr. Knieser's OPRs**

Dr. Knieser examined Mr. Davis on July 30, 2020. Dkt. 91-1 at 84–90. In addition to the hernia, Dr. Knieser found a fascial defect and nodules in Mr. Davis's lower abdomen. *Id.* He submitted an OPR for a CT scan to confirm that the nodules were not cancerous. *Id.* The record does not tell what became of this OPR. Mr. Davis underwent an x-ray on August 4, 2020, *id.* at 90–94, but the results are not documented in the record. On August 13, Dr. Knieser submitted a second OPR for a CT scan of Mr. Davis's abdomen, with special concern for the nodules he discovered during his July 30 exam. *Id.* at 96–103.

Mr. Davis visited with PA Wilson on August 28, 2020. Dkt. 91-1 at 108–11. Her treatment notes do not indicate that they discussed his hernia or that she recognized a hernia when examining his abdomen. *Id.*

Mr. Davis went to the hospital for a CT scan on September 2, 2020. *Id.* at 114–15. Nurse Smith attempted to take Mr. Davis's vital signs when he returned, but he refused. *Id.* Results from the CT scan are not in the record.

Mr. Davis saw Nurse Smith again on September 26 and reported that, in addition to serious pain from his hernia, he was experiencing blood in his stool. Dkt. 91-1 at 116–18. Nurse Smith referred Mr. Davis for examination by Dr. Knieser.

Mr. Davis saw Dr. Knieser on October 5. Dkt. 91-1 at 119–24. Dr. Knieser observed that Mr. Davis's hernia was "opening" and submitted an OPR for consultation with a general surgeon. Dkt. 91-1 at 119–24. However, no action was taken on the OPR for six weeks.

Mr. Davis saw PA Wilson on November 17, 2020. *Id.* at 125–28. Her notes document Mr. Davis's pain due to the hernia and state that Dr. Knieser's OPR "was never brought to the attention of the clerk and never sent for review." *Id.* at 125. PA Wilson notified Ms. Love, who submitted the OPR to the utilization management team. *Id.* Dr. Mitcheff approved the OPR on November 18. *Id.* at 129–34.

### E.   Mr. Davis's Surgical Consultation and Dr. Knieser's Alternative Treatment Plan

Mr. Davis left the prison to consult with a surgeon on December 17, 2020. *Id.* at 139–40. The surgeon found surgery appropriate and planned to schedule an operation as soon as the prison medical staff approved it. *Id.* at 139–40, 541. Nurse Smith's notes indicate that, when he returned, Mr. Davis once again refused to have his vital signs taken. *Id.* at 139–40.

Mr. Davis's surgery was not scheduled by mid-January 2021, and there is no indication that an OPR was submitted to request approval of the surgery. He met with Dr. Knieser on January 19. Dkt. 91-1 at 141–42. Dr. Knieser wrote in his treatment notes from January 19 that he interpreted Mr. Davis's refusal to have his vital signs taken on December 17 "as a poor mental attitude about being cocoperative [sic] after surgery." *Id.* at 141. He wrote that he would submit an alternative treatment plan "suggesting conservative treatment" and "hold on surgery due to still uncooperative attitude." *Id.* No evidence tells what that conservative treatment was to entail.

F.     **Mr. Davis's Kidney Cyst and Hernia Surgery**

Mr. Davis met with Dr. Knieser again on February 25, 2021. Dkt. 91-1 at 144–46. In addition to groin pain, Mr. Davis reported blood in his urine. *Id.* An x-ray revealed that he had a kidney stone. On March 5, PA Wilson submitted an OPR requesting that Mr. Davis receive an ultrasound to examine a cyst on his kidney. *Id.* at 147–49.

On March 8, Mr. Davis met with PA Wilson. *Id.* at 150–58. She prescribed the pain medication Toradol and submitted an OPR requesting that Mr. Davis receive surgery to repair his inguinal hernia. *Id.* The OPR was approved, and Mr. Davis received hernia surgery on March 25. *Id.* at 159–162.

PA Wilson states that she submitted the OPR requesting Mr. Davis's hernia surgery because "he consented to follow post-operative instructions." Dkt. 96-5 at ¶ 7. The record does not demonstrate that he previously refused to follow post-operative instructions or even that he was presented an opportunity to do so.

G.     **Postsurgical Care**

Mr. Davis alleges generally that, when he returned from surgery, Nurse Smith deprived him of pain medication, materials to change his surgical dressings, and use of a wheelchair. *See* dkt. 91

7

at 19–21. But Mr. Davis was discharged with no restrictions on walking. Dkt. 91-1 at 465. And he does not dispute that he received regular dressing changes and some injections of pain medication on his return from the hospital. *See generally* dkt. 96-11 at 34:3–36:1; dkt. 95-1 at 75 (medication administration record). Mr. Davis's discharge instructions from the hospital refer to mediation but are difficult to read and do not clearly indicate that he was to receive ongoing oral pain medication following his return to prison. Dkt. 91-1 at 465.

On April 14, 2021, Mr. Davis met with Dr. Knieser and complained of pain near the surgical site. *Id.* at 170–72. Dr. Knieser prescribed two days of Tramadol for Mr. Davis's pain. *Id.*

On April 22, Dr. Knieser requisitioned an x-ray after he suspected he felt a metallic nodule in Mr. Davis's scar. *Id.* at 173–76. He did not order more pain medication. *Id.* The x-rays showed no foreign objects in Mr. Davis's body. *Id.* at 177–78.

On April 30, Dr. Knieser observed a "large mass of movable tissue" and a "visible thread" near the surgical site. *Id.* at 179–81, 193–96. Dr. Knieser submitted an OPR to allow Mr. Davis to meet with the surgeon. *Id.* That visit occurred on May 13, 2021. *Id.* at 200–01. There is no evidence that further treatment was directed.

### III.
### Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2)

8

a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The medical defendants do not dispute that Mr. Davis's hernia presented a serious medical need.[1] The dispositive question, then, is whether each defendant acted with deliberate indifference—that is, whether he or she consciously disregarded a serious risk to Mr. Davis's health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Plaintiff "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id*. "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted).

The Seventh Circuit has "held that a jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). The Seventh Circuit has also held that deliberate indifference occurs when the defendant:

---

[1] To the extent the medical defendants argue that Mr. Davis cannot satisfy the objective element of deliberate indifference, they argue that "there is no medical evidence . . . supporting [the] assertion" that Mr. Davis "should have undergone surgery sooner." Dkt. 95 at 13. But several pieces of evidence—including Dr. Buckley's OPR requesting imaging based on the hernia's concerning location and potential for strangulation, Dr. Knieser's OPR requests for imaging and surgical consultation, and the surgeon's finding that surgery was warranted—all would allow a reasonable jury to find that Mr. Davis had a serious medical condition at all relevant times. *See Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) ("A medical condition is serious if it 'has been diagnosed by a physician as mandating treatment' or 'is so obvious that even a lay person would perceive the need for a doctor's attention.'") (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)).

- refuses "to take instructions from a specialist." *Petties*, 836 F.3d at 729.
- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.
- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).
- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Dean*, 18 F.4th at 241–42.

**A.     Dr. Knieser**

The evidence would allow a reasonable jury to resolve Eighth Amendment claims against Dr. Knieser in either side's favor. Accordingly, summary judgment is not warranted for either party.

Viewed most favorably to Dr. Knieser, the record shows that he examined Mr. Davis on July 30, 2020, and became concerned about Mr. Davis's condition. He immediately submitted an OPR to obtain a CT scan and submitted a second OPR two weeks later. When he saw that Mr. Davis's hernia was opening in October, he submitted another OPR to request surgical consultation. These actions all reflect that Dr. Knieser gave Mr. Davis's hernia considerable attention and exercised his medical judgment to diagnose and treat the condition. Similarly, when Mr. Davis complained of pain following his surgery, Dr. Knieser prescribed pain medication and promptly ordered imaging and a follow-up appointment with the surgeon.

On the other hand, evidence would support a jury in concluding that Dr. Knieser caused or allowed an inexplicable delay in Mr. Davis's care with no penological purpose. *Petties*, 836 F.3d at 730. Dr. Knieser submitted OPRs for a CT scan on July 30 and August 13, 2020, because he found Mr. Davis's hernia to be a serious condition, but no evidence indicates that he reviewed the

results of the CT scan for over a month after it took place on September 2. Dr. Knieser submitted an OPR for a surgical consultation after observing on October 5 that Mr. Davis's hernia was opening, but no action was taken for six weeks, at least in part because he did not alert Ms. Love to the OPR. Perhaps a jury could find that this was a simple mistake. But perhaps a jury could also find that, given his apparent level of concern over Mr. Davis's hernia, Dr. Knieser's failure to ensure proper submission of the OPR or follow up on it reflected deliberate indifference.

Most obviously, a jury could reasonably find deliberate indifference from Dr. Knieser's decision on January 19, 2021, to delay Mr. Davis's hernia surgery. Dr. Knieser overrode the judgment of the surgeon—a specialist—that surgery was warranted. *See Petties*, 836 F.3d at 729. He contends that he did so because Mr. Davis had refused to have his vital signs taken a month earlier. But Dr. Knieser requested a surgical consultation on October 5 even though Mr. Davis refused to have his vital signs measured when he returned from the September 2 CT scan. A jury *could* accept Dr. Knieser's testimony that his decision to delay the surgery in January was based on a good faith judgment that Mr. Davis was unlikely to cooperate with postsurgical orders. But a jury could also consider that Dr. Knieser responded differently only a few months earlier and find his decision to delay surgery arbitrary or malicious. Further, although Dr. Knieser stated that Mr. Davis would move forward with an "alternative" treatment plan grounded in more "conservative" care, no evidence tells what conservative treatment he had in mind or whether Mr. Davis actually received it. Dkt. 91-1 at 141. As a result, a jury could reasonably find that Dr. Knieser opted to provide no treatment at all, or to persist in a course he knew to be ineffective, or to take an easier path with no particular benefit. *Petties*, 836 F.3d at 729–30.

Because a jury could resolve these claims in either party's favor, neither is entitled to summary judgment.

11

**B.      Dr. Mitcheff and Ms. Love**

The record also would allow a reasonable jury to resolve Eighth Amendment claims against Dr. Mitcheff and Ms. Love in either side's favor. Accordingly, summary judgment is not warranted for any party.

Dr. Buckley found Mr. Davis's hernia concerning and submitted an OPR requesting imaging on January 29, 2020. No action was taken with respect to that OPR. Mr. Davis did not receive any imaging until August 4, 2020. A jury could reason that inaction on Dr. Buckley's OPR set Mr. Davis's treatment back six months.

The protocol for processing OPRs is not crystal clear, but the record establishes that Ms. Love was responsible for pulling an OPR from an inmate's medical chart and forwarding it to the utilization management team and that Dr. Mitcheff was responsible for reviewing the OPR after receiving it from the utilization management team. When Dr. Knieser's OPR requesting surgical consultation languished in the fall of 2020, the record documents that the OPR "was never brought to the attention of the clerk and never sent for review." Dkt. 91-1 at 125. But the record—including the parties' affidavits—offers no explanation why Dr. Buckley's OPR received no action.

A jury could reasonably determine that no evidence shows that either Dr. Mitcheff or Ms. Love was subjectively aware of Dr. Buckley's OPR or otherwise knew about Mr. Davis's need for hernia imaging. But the record's silence on the processing of the first OPR also precludes summary judgment for Dr. Mitcheff or Ms. Love. Each was responsible for processing OPRs. Dr. Buckley's OPR was not processed, but neither Dr. Mitcheff nor Ms. Love offers evidence that they completed their part of the process. Given the record's silence, a jury could reasonably infer that Ms. Love never received Dr. Buckley's OPR, or that she received it but took no action, or that

she properly forwarded it, or that it never reached Dr. Mitcheff, or that Dr. Mitcheff received it but took no action. With these facts unresolved, summary judgment is not possible in either direction.

**C.      Wexford**

Mr. Davis's claims against Wexford cannot be resolved at summary judgment.

"[A] private corporation that has contracted to provide essential government services is subject to at least the same rules that apply to public entities," meaning it may be liable for constitutional violations caused by its policies, practices, and customs. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). "The central question is always whether an official policy, however expressed . . . , caused the constitutional deprivation." *Id.* at 379. Put otherwise, "is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?" *Id.* at 381.

The medical defendants argue that they are entitled to summary judgment because no Wexford employee violated Mr. Davis's constitutional rights. *See* dkt. 95 at 18; *see also Gaetjens v. City of Loves Park*, 4 F.4th 487, 495 (7th Cir. 2021) (An entity "cannot be liable under *Monell* when there is no underlying constitutional violation by" one of its employees.). But a jury could reasonably find a constitutional violation for the reasons noted above and further discussed below.

The medical defendants also argue that Mr. Davis cannot present evidence that Wexford maintained an unconstitutional policy or practice. But the record would allow a reasonable jury to find that a Wexford policy or practice caused unnecessary, unconstitutional delays to his hernia treatment.

The medical defendants' filings indicate that it had a policy or practice for determining when inmates could receive care outside the prison walls and for administrating that care. A

treating physician submitted an OPR, which Ms. Love forwarded to the utilization management team, which eventually forwarded it to Dr. Mitcheff for approval or denial. The record illuminates plain flaws in this policy or practice. Dr. Buckley's OPR received no action at all, and Dr. Knieser's OPR requesting a surgical consultation languished for weeks because he did not alert Ms. Love he submitted it.

Wexford erected a multi-tiered approval system for inmates whose serious medical needs required specialized treatment. In *Glisson*, the Seventh Circuit held that "the need to establish protocols for the coordinated care of chronic illnesses is obvious" and that the failure to develop and implement adequate protocols can demonstrate deliberate indifference to that need. 849 F.3d at 382. A jury might find that Dr. Buckley's and Dr. Knieser's OPRs received no attention due to the negligence or deliberate indifference of individual actors. But it also might reasonably find that Wexford knowingly developed and implemented a system with gaps that allowed requests for important outpatient care to sit idle. Summary judgment is not appropriate for either party.

### D. PA Wilson

Factual disputes also prevent the Court from resolving claims against PA Wilson at summary judgment.

The medical defendants argue that the care PA Wilson provided Mr. Davis reflected acceptable exercises of medical judgment. The record would allow a jury to reach that conclusion with respect to the treatment PA Wilson provided, so the Court cannot grant Mr. Davis summary judgment against her. After all, she was responsible for submitting the OPRs that resulted in his surgery.

Yet, the record establishes that PA Wilson met with Mr. Davis in February and March 2020 while Dr. Buckley's OPR was pending, but she took no action to ensure that it was reviewed.

PA Wilson does not address this period in her affidavit and therefore does not explain why she took no action with respect to Dr. Buckley's OPR. *See* dkt. 96-5. Months later, PA Wilson recognized during an appointment with Mr. Davis that Dr. Knieser's OPR was not properly submitted. Together, these facts support an inference that PA Wilson may have recognized in the winter of 2020 that Mr. Davis had a concerning hernia requiring prompt attention, that she could have taken steps to ensure that it received that attention, and that she declined to do so. Based on these facts, the Court cannot grant PA Wilson summary judgment.

**E.     Nurse Smith**

No reasonable jury could find that Nurse Smith was deliberately indifferent to Mr. Davis' serious medical needs. As a result, she is entitled to summary judgment.

The defendants argue—correctly—that Nurse Smith had only two material interactions with Mr. Davis and responded appropriately both times. She referred Mr. Davis to Dr. Knieser in September 2020 and followed his discharge instructions in March 2021. Of course, Mr. Davis asserts that Nurse Smith should have given him bandages and pain medication to keep in his cell and a wheelchair, but his discharge instructions were not consistent with those requests. Indeed, the undisputed record shows that Mr. Davis was discharged with no restrictions on walking and that he received regular dressing changes and some injections of pain medication on his return from the hospital. *See* dkt. 91-1 at 465; dkt. 96-11 at 34:3–36:1; dkt. 95-1 at 75 (medication administration record). To the extent Mr. Davis's discharge instructions refer to medication other than the injections Mr. Davis received, it is not clear that they called for an ongoing prescription or that Nurse Smith was responsible for failing to fill the prescription. *See* dkt. 91-1 at 465. On these facts, no reasonable jury could find deliberate indifference.

15

### F.     Nurses Morris and Mitchell

Mr. Davis asserts broadly in his summary judgment brief that Defendants Mitchell and Morris "were deliberate indifferent and hindered his care by refusing to refer" him for care by a doctor. Dkt. 91 at 18, 21; see also dkt. 105 at 20, 22. He does not name Nurse Morris or Nurse Mitchell in any of his statements of facts. Dkts. 93, 107, 108. In a case like this, which spans more than a year and thousands of pages of exhibits, such broad assertions do not aid the Court in identifying facts that require or preclude summary judgment. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); see also S.D. Ind. L.R. 56-1(e), (h) ("The court has no duty to search or consider" parts of the record unless the party supports his assertion *by citing a page or paragraph* or otherwise similarly specifying where the information can be found in the supporting evidence.") (emphasis added). Because Mr. Davis has not directed the Court to specific acts or omissions by Defendants Mitchell and Morris in his briefs, the Court has reviewed Mr. Davis's claims against Nurses Morris and Mitchell as framed in his deposition.

The crux of Mr. Davis's claims against Nurse Morris is that she was deliberately indifferent to complaints that he did not receive pain medication, gauze, and bandages after his hernia surgery. *See* dkt. 96-11 at 29:16–30:1. However, she was not directly involved in his medical care; rather, Mr. Davis raised these complaints "in passing" when he was in the medical department. *Id.* at 31:6–13. More importantly, Mr. Davis does not dispute that he received pain medication and regular dressing changes following his surgery. *See generally* dkt. 96-11 at 34:3–36:1; dkt. 95-1 at 75. On these facts, no jury could find deliberate indifference by Nurse Morris, and she is entitled to summary judgment.

The crux of Mr. Davis's claims against Nurse Mitchell is that he submitted healthcare request forms and she did not forward them to the appropriate parties. Dkt. 96-11 at 28:11–29:12. Nurse Mitchell's employment at PCF ended on March 13, 2020. Dkt. 96-7 at ¶ 2. And, although Mr. Davis has filed dozens of healthcare requests with his summary judgment materials, *see* dkt. 91-1 at 410–439, no evidence indicates that Nurse Mitchell received any of them. In fact, none appear to be from the time she was employed at PCF. On these facts, no jury could find deliberate indifference by Nurse Mitchell, and she is entitled to summary judgment.

**G.    Ms. Hamblen**

Mr. Davis argues that Ms. Hamblen demonstrated deliberate indifference through responses she offered to grievances he filed concerning his healthcare. *See* dkt. 91 at 8, 22; dkt. 105 at 9, 23. Generally, a plaintiff cannot demonstrate an Eighth Amendment violation by showing that a prison official responded unfavorably to his grievances.[2] A prison official presented with a grievance typically satisfies the Constitution by investigating the grievance and responding to it. *Hill v. Nicholson*, 829 F. App'x 141, 143 (7th Cir. 2020) (citing *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)). An officer reviewing a grievance "can rely on the expertise of medical personnel." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). If the officer learns that the prisoner "is under the care of medical experts," she "will generally be justified in believing that the prisoner is in capable hands." *Id.* In this situation, the grievance officer is deliberately

---

[2] *See, e.g.*, *Estate of Miller by Chassie v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017). ("[P]rison officials who reject prisoners' grievances do not become liable just because they fail to ensure adequate remedies."); *McGee v. Adams*, 721 F.3d 474, 485 (7th Cir. 2013) ("McGee's claims against . . . the individuals who ruled against McGee on the institutional grievances he filed . . . fail as a matter of law."); *George v. Smith*, 507 F.3d 605, 609–610 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation. A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not.").

indifferent only if she disregards evidence that the medical staff is mistreating the prisoner or not treating the prisoner at all. *Id.*

The Court understands that, when an inmate submitted a grievance regarding a medical issue, the prison's grievance officer forwarded it to Ms. Hamblen, who reviewed the inmate's medical records and responded to the grievance specialist with information about the inmate's condition and what care had been provided. *See* dkt. 96-9 at ¶ 5; *see also, e.g.*, dkt. 91-1 at 378 (grievance response report). Mr. Davis cites a spreadsheet documenting inquiries from the grievance specialist to Ms. Hamblen on March 11 and May 24, 2021, and Ms. Hamblen's responses to the grievance specialist. Dkt. 91-1 at 543–44. On March 11, PA Wilson's OPR requesting hernia surgery had been submitted, and, on May 24, 2021, Mr. Davis had already returned to the surgeon for his follow-up visit. It is not clear what more Ms. Hamblen could have done to meet Mr. Davis's medical needs on those dates.

Mr. Davis also cites a grievance he submitted in late March 2021, after his hernia surgery, complaining that he was not provided gauze, ointment, or a wheelchair upon his return. Dkt. 91-1 at 384. Ms. Hamblen's response to the grievance specialist stated: "Upon return from the hospital you had steri strips and no dressing, therefore gauze and ointment was not medically indicated. As for the wheelchair being ordered it is always best to walk after some kind of surgery to get the gas out of your system from being put under." *Id.* at 389. Mr. Davis argues that it was improper for Ms. Hamblen to respond with medical advice rather than being responsive to his complaints. Nevertheless, no reasonable jury could find her deliberately indifferent given that her response was consistent with Mr. Davis's discharge instructions to walk and given the undisputed fact that he received regular dressing changes. Ms. Hamblen is entitled to summary judgment.

## IV.
## Conclusion

Mr. Davis's motion for summary judgment, dkt. [90], is **denied** as to the medical defendants. The medical defendants' motion, dkt. [94], is **granted** as to Nurse Smith, Nurse Morris, Nurse Mitchell, and Ms. Hamblen, and **denied** as to all other defendants.

Claims against Nurse Smith, Nurse Morris, Nurse Mitchell, and Ms. Hamblen are **dismissed with prejudice**. No partial final judgment will issue. The **clerk is directed** to **terminate** these defendants from the docket.

The **clerk is directed** to change the spellings of the following defendants' names on the docket. *See, e.g.*, dkt. 95.

| Old Name | New Name |
| --- | --- |
| Michael Mitchef, Regional Medical Director | Michael Mitcheff, Regional Medical Director |
| Martial Kneizer, M.D. | Martial R. Knieser, M.D. |
| Sheri Wilson, Nurse Practicioner | Sheri Wilson, PA-C |

Mr. Davis's claims against the medical defendants who remain will be resolved by settlement or trial. The Court intends to recruit an attorney to represent Mr. Davis through final judgment. The **clerk is directed** to include a form motion for assistance with recruiting counsel with Mr. Davis's copy of this order. Mr. Davis will complete and return the form **no later than March 8, 2024**.

**IT IS SO ORDERED.**

Date:   2/16/2024

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

BENFORD DAVIS
860681
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com

Rachel D. Johnson
Stoll Keenon Ogden PLLC
rachel.johnson@skofirm.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com

Adam Jeffery Strahan
Lewis and Wilkins
strahan@lewisandwilkins.com

William Dean Young
Lewis And Wilkins LLP
young@lewisandwilkins.com